UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



MICHAEL COSME,

          Plaintiff,

  -against-

THE CITY OF NEW YORK; New York City
Police Department ("NYPD") Detective
MICHAEL DONNELLY (Tax ID # 883801); and
NYPD Detective THOMAS AIELLO (Tax ID #
868427),

          Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.     Plaintiff Michael Cosme ("Plaintiff") spent almost eighteen years in prison for two murders he did not commit.

2.     Plaintiff and five other individuals were wrongfully accused of the 1995 murders of a Federal Express executive named Denise Raymond and a livery taxi driver named Baithe Diop. Plaintiff, along with Carlos Perez and Devon Ayers, was convicted of both murders. Israel Vasquez was convicted for the Raymond murder only, and Eric Glisson and Cathy Watkins were convicted for the Diop murder. These six individuals spent an aggregate total of more than a century imprisoned before their innocence was finally proven. None of them was in any way involved in the commission of either murder.

3.     Defendants Michael Donnelly and Thomas Aiello (collectively the "Individual Defendants") were the two NYPD detectives who led the investigation that wrongfully implicated Plaintiff and the others. Their intentional misconduct led directly to Plaintiff's wrongful arrest, conviction, and imprisonment. The Individual Defendants concocted a

conspiracy theory according to which the two murders were related.  They manufactured the entire prosecution by coercing and bribing two "witnesses" to give false testimony that placed Plaintiff at the scene of both murders and attributed damning inculpatory statements to him.   To overcome the fact that these witnesses' false stories were self-contradictory and implausible, the Individual Defendants fed them non-public details about the murders to make them seem credible.  The Individual Defendants also suppressed evidence that would have disproven the case against Plaintiff, including surveillance footage that undermined the testimony of a third "witness" and phone records that would have implicated the real murderers.

4.    Had the Individual Defendants followed up on basic leads instead of intentionally framing six innocent people, they would have caught Baithe Diop's real murderers (who have since confessed to the crime) and prevented several heinous crimes that those individuals instead remained free to commit.

5.    The case the Individual Defendants contrived rested principally on the false testimony of three witnesses.  First, a troubled sixteen-year-old named Cathy Gomez claimed she overheard Plaintiff and others planning the murders in a secret meeting and then later bragging about their crimes in a local park.  Second, a neighborhood drug addict named Miriam Tavares claimed she witnessed the Diop homicide in intricate detail while perched on top of her toilet, peering out through a four-inch crack in her bathroom window into the dead of night.  Finally, Kim Alexander—Ms. Raymond's co-worker—testified that she saw a man named Charles McKinnon, the alleged mastermind of the Raymond murder, harassing and stalking Ms. Raymond as she left her office on the evening she was killed.

6.    This "evidence" was an elaborate farce contrived by Defendants Donnelly and Aiello.  The testimony of all three witnesses was a product of the Individual Defendants'

imaginations.

7.      The Individual Defendants threatened, cajoled, coerced, and bribed Ms. Tavares

and Ms. Gomez to give perjured testimony.  They fed the women non-public details about both

crime scenes to bolster their credibility and coached them to lie to the Grand Jury and at trial.

Ms. Gomez has confirmed this misconduct in sworn testimony.

8.      Defendants Donnelly and Aiello also manufactured Ms. Alexander's version of

events.  Ms. Alexander's account was contradicted by surveillance footage from Ms. Raymond's

workplace, which showed Ms. Raymond and Ms. Alexander leaving work together on the night

in question—with Charles McKinnon nowhere in sight.  Defendants intentionally suppressed that

footage to ensure that the prosecution's theory of the crimes would go uncontradicted and

Plaintiff would be convicted in spite of the truth.  Plaintiff learned of this exculpatory evidence

for the first time in 2012, after it had been concealed for 17 years.

9.      After Plaintiff had spent years in prison, an independent investigation

spearheaded by the office of the United States Attorney for the Southern District of New York

blew the case wide open.  That investigation showed that two gang members, unconnected to

Plaintiff or his alleged co-conspirators, committed the Diop murder acting alone.  These

belatedly unearthed facts showed that the witnesses against Plaintiff had lied, leading the District

Attorney's Office to concede that he should be released from prison and the charges against him

dropped.

10.     This is a civil action pressing claims pursuant to 42 U.S.C. § 1983, the Fourth and

Fourteenth Amendments to the United States Constitution, and New York law.  This action seeks

monetary damages for Plaintiff's unlawful arrest, malicious criminal prosecution, wrongful

conviction, and imprisonment due to violations of his fundamental federal constitutional rights to

due process and to be free from unreasonable search and seizure.

11.     The Individual Defendants instigated and continued the prosecution of Plaintiff without probable cause to believe Plaintiff to be guilty of the crimes charged, and failed to turn over exculpatory evidence to the District Attorney's Office, and manufactured evidence through highly-suggestive, unfair, and unreliable investigative procedures that tainted alleged witnesses' recollections and encouraged perjured testimony.  Their conduct led to the wrongful and unjust prosecution of Plaintiff.

12.     Defendant the City of New York (the "City") is liable for violations of state law perpetrated by its employees under the doctrine of *respondeat superior.*

## PARTIES AND JURISDICTION

13.     This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiff's claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of State law, of rights guaranteed by the Constitution of the United States.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Plaintiff  has complied with the requirements of New York General Municipal Law Section 50-i by serving on the Office of the Comptroller of the City of New York a notice of claim on March 7, 2013 and an amended notice of claim on October 10, 2013.  More than 30 days have elapsed since Plaintiff served those notices of claim and no offer of settlement has been made.

16.     Plaintiff submitted to a hearing pursuant to New York General Municipal Law Section 50-h on December 9, 2013.

17.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this judicial district.

18.     At all times herein mentioned, Plaintiff was a resident of the County of the Bronx, City and State of New York.

19.     Defendant City of New York ("City") is a municipal corporation existing by virtue of the laws of the State of New York.

20.     Defendant Michael Donnelly, Tax I.D. No. 883801, was at all relevant times a detective employed by the NYPD.  He is named here in his individual capacity.

21.     Defendant Thomas Aiello, Tax I.D. No. 868427, was at all relevant times a detective employed by the NYPD.  He is named here in his individual capacity.

22.     At all times relevant to this Complaint, the aforementioned Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

#### Procedural History of Underlying Criminal Cases

23.     The underlying criminal cases involved two homicides that occurred in the Bronx in January 1995.

24.     The first of these homicides was an execution-style murder of a Bronx woman, Denise Raymond, which occurred on the evening of January 17, 1995.

25.     Two days after Ms. Raymond's death, a livery cab driver, Baithe Diop, was shot to death at the wheel of his taxi on January 19, 1995.

26.     Although there was no evidence to link the two crimes, the Individual Defendants maliciously conspired to present false evidence that both of these crimes were committed by the

same people.

27.     Defendant Donnelly unlawfully arrested Plaintiff on February 3, 1995 for the murder of Baithe Diop.  Defendant Donnelly came to Plaintiff's home with other NYPD officer(s), who falsely told Plaintiff he was being brought to the precinct because of an altercation he had been in with an acquaintance of his mother's.  At the precinct, he was fingerprinted, photographed, patted down, strip-searched, and instructed to squat, bend over, and cough.

28.     After some time, Detective Donnelly brought Plaintiff to an interrogation room. He did not inform Plaintiff of his right to remain silent or his right to an attorney.  Instead, Defendant Donnelly showed Plaintiff photographs of Mr. Diop's dead body and asked Plaintiff if he knew Mr. Diop.

29.     Plaintiff told Defendant Donnelly he had never seen Mr. Diop before in his life.

30.     Undeterred, Defendant Donnelly accused Plaintiff of murdering Mr. Diop.

31.     Plaintiff protested his innocence at the time of his arrest.  In a videotaped statement recorded at approximately 1:00 a.m. that night, Plaintiff said: "I only have one thing to say . . . .  I'm innocent.  I didn't do it.  I wasn't there.  I was in my house asleep."

32.     He continued to maintain his innocence until the day he was exonerated.

33.     After the Individual Defendants conspired to create false evidence that Ms. Raymond's murder and Mr. Diop's murder were committed by the same individuals, Plaintiff was indicted for both murders on March 14, 1995 (Bronx Indictment No. 1086/95).

34.     Plaintiff continued to maintain his innocence and pled not guilty.  Following a jury trial conducted by Assistant District Attorney Daniel McCarthy in the Supreme Court, Bronx County, Plaintiff was convicted on March 5, 1997 by a jury on one count of murder in the

second degree and one count of second degree felony murder for the killing of Ms. Raymond, as well as one count of murder in the second degree and one count of second degree felony murder for the killing of Mr. Diop.

35.    On May 8, 1997, Plaintiff was sentenced to two concurrent prison terms of twenty-five years to life.

36.    Plaintiff appealed his conviction.  On October 24, 2000, the Appellate Division, First Department, unanimously affirmed Plaintiff's judgment of conviction and sentence.  *People v. Ayers*, 276 A.D.2d 392 (N.Y. App. Div. 2000).

37.    Plaintiff then petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On October 3, 2003, that petition was denied by Judge Harold Baer, Jr. of the United States District Court for the Southern District of New York.  *Cosme v. Greiner*, No. 02 Civ. 3444, 2003 WL 22290215 (S.D.N.Y. Oct. 3, 2003).

38.    On December 12, 2012, Plaintiff's convictions for the Diop murder were finally vacated, and the corresponding counts of the indictment against him dismissed, on the consent of the Bronx District Attorney's Office after evidence came to light proving his innocence.

39.    Plaintiff was released from prison on January 23, 2013 after the Bronx District Attorney's Office agreed that his convictions for the Raymond murder should also be vacated.

40.    Plaintiff spent almost eighteen years in prison for crimes he did not commit.

41.    On September 20, 2013, after the Bronx District Attorney's Office conducted a re-investigation of the two murders, the indictment against Plaintiff was dismissed in its entirety.

**The 1995 Police Investigation**

42.    Denise Raymond came home to her apartment, in the Soundview area of the Bronx, after work on the evening of January 17, 1995.  Based on the crime scene investigation, it

appeared that Ms. Raymond was accosted as she entered her apartment on Boynton Avenue in the Bronx, after which she was dragged to her bedroom, handcuffed, blindfolded, gagged, and then shot twice in the head.

43.     Two days later, at approximately 4:30am on January 19, 1995, Baithe Diop—a Senegalese livery taxi driver who had no connection to Ms. Raymond—was found dead in his cab on Croes Avenue between Lafayette and Seward Avenues in the Bronx.  He had been shot twice, once in the upper back and once in his right side.

44.     Defendants Donnelly and Aiello, detectives employed by the NYPD, investigated the two homicides.  Defendant Aiello was the lead detective assigned to the Raymond murder, while Defendant Donnelly was the lead detective assigned to the Diop murder.  The two worked together closely and investigated the crimes in tandem.  New York Magazine published a feature article called "How to Solve a Murder," which discussed the investigation into the two murders and detailed the Individual Defendants' collaborative efforts.  The two detectives worked together so closely that the prosecution at Plaintiff's trial even treated them as the same person, stipulating that the defense could "pose any questions to Donnelly which they could pose to Aiello, and I'm not going to object on the grounds that it's Donnelly versus Aiello."

45.     During the investigation, the Individual Defendants repeatedly questioned two supposed "witnesses": a teenager named Cathy Gomez and a woman named Miriam Tavares.

46.     In January 1995, Ms. Gomez was repeating ninth grade for the second time; she would never complete it.  She was enrolled in school, but she rarely attended class and could not read or write English.

47.     Ms. Tavares was a neighborhood drug addict who spoke only Spanish.

48.     Playing on the two women's vulnerabilities, Defendants Donnelly and Aiello

coerced, cajoled, threatened and bribed them to provide what the Individual Defendants knew was false testimony with the purpose of obtaining Plaintiff's unlawful arrest, wrongful conviction, and unjust imprisonment.

49.     The Individual Defendants also relied heavily on a third alleged witness, Kim Alexander.  Ms. Alexander had been a co-worker of Denise Raymond's.  She claimed that she left work with Ms. Raymond on January 17, 1995, shortly before Ms. Raymond was murdered. Ms. Alexander claimed that as she and Ms. Alexander exited their office building, an African-American man (whom she subsequently identified as Charles McKinnon) appeared and began harassing Ms. Raymond.  Ms. Alexander's story bolstered the Individual Defendants' theory that Mr. McKinnon masterminded the Raymond murder and ordered Plaintiff and his co-defendants to carry it out.

50.     But Mr. McKinnon had not been at Ms. Raymond and Ms. Alexander's workplace the night of the murder, and the Individual Defendants knew it.  Defendant Aiello had viewed surveillance footage from the building, recorded on the night in question, which showed Ms. Alexander and Ms. Raymond leaving together—and showed Ms. Raymond wearing the exact outfit and carrying the exact parcels Ms. Alexander's testimony described—with no African-American man anywhere in sight.  Knowing this evidence would undermine the fabricated case against Plaintiff and his co-defendants, Defendant Aiello suppressed the footage and falsely told prosecutors it showed nothing of value to the investigation.

51.     Defendants used a series of unconstitutional and improper tactics to secure Plaintiff's indictment and conviction.  These tactics included, but were not limited to: questioning Cathy Gomez and Miriam Tavares together and using Ms. Gomez as a translator for Ms, Tavares, thereby tainting both women's accounts; feeding Ms. Gomez and Ms. Tavares

details about the crime scenes and police investigation that were unknown to the witnesses and then coercing them to testify that they learned the information from Plaintiff and his co-defendants; threatening to unjustifiably jail Ms. Gomez's parents and interrogating her younger brother and threatening to prosecute him; using suggestive witness identification procedures; giving both women, who were indigent, financial incentives to provide false incriminating evidence; fabricating an alleged spontaneous confession by Plaintiff; and failing to turn over exculpatory evidence, including the surveillance video that disproved Ms. Alexander's testimony, to the prosecution.  The Individual Defendants knew the testimony upon which the case against Plaintiff relied was false.

### Cathy Gomez

52.     In order to achieve their goal of inculpating Plaintiff, the Individual Defendants forced Cathy Gomez to lie about his involvement in the Raymond and Diop murders.

53.     Even before Plaintiff was arrested, Ms. Gomez specifically told Defendant Donnelly that she had no independent personal knowledge of any facts relating to the Raymond murder.  Indeed, she did not even know the murder occurred until Defendant Donnelly told her about it.

54.     Yet after meeting repeatedly with the Individual Defendants, Ms. Gomez gave a slew of false statements concerning Plaintiff and his co-defendants, including both before the Grand Jury and at trial.

55.     On February 1, 1995, Ms. Gomez—who could not read or write English well—signed a statement that was handwritten for her by Defendant Donnelly.  The statement Donnelly concocted stated that Plaintiff confessed to Ms. Gomez on the evening of January 19, 1995 that he had killed the "taxi man."  The statement said that Plaintiff and "Eric" had shot the driver in

the course of attempting to rob him.  The statement also said that Ms. Gomez was with Plaintiff

approximately three days before the taxi driver was murdered.  At that time, the statement said,

Plaintiff had "pulled out a small silver revolver" and played with it, and had also made

statements about killing people.  Finally, the statement alleged that a week after the taxi driver's

murder, Plaintiff showed Ms. Gomez the gun again along with a phone he claimed to have stolen

from the taxi driver.

56.     Defendant Donnelly required Ms. Gomez to sign the statement, but did not read it

to her or translate it for her, even though he knew she could not read English.  Defendant

Donnelly knew the statement to be false, and required Ms. Gomez to sign it anyway.

57.     Ms. Gomez learned what the statement actually said—that is, what information it

attributed to her—for the first time in August of 2012, after Plaintiff had been in prison for more

than 17 years.  She was aghast.

58.     Around the same time, the Individual Defendants also attempted to force Cathy

Gomez's brother, Hanley Gomez, Jr., to falsely implicate Plaintiff and his co-defendants.  As

with Ms. Gomez, Defendants Donnelly and Aiello attributed statements to Mr. Gomez that he

had never made and caused him to sign them without understanding their contents.  But unlike

his sister, Mr. Gomez resisted the Individual Defendants' threats and coercion and refused to

participate in the Grand Jury and trial proceedings against Plaintiff (and tried unsuccessfully to

convince his sister to do the same) because he knew the facts attributed to him and to his sister

were false.

59.     Thereafter, the Individual Defendants met with Ms. Gomez repeatedly, coaching

her to make false statements implicating Plaintiff in the Raymond and Diop murders.  For

example, they told her to say that she had seen Plaintiff and others planning to kill two people—

"a taxi driver and a girl"—in a secret meeting at Plaintiff's home; that she had seen a group of men discussing and bragging about the Raymond murder after the fact and passing around a VCR, credit card, and jewelry stolen from Ms. Raymond's apartment; that Plaintiff had come to Ms. Gomez's home shortly after the Diop murder and brandished a bloody gun; that Plaintiff had admitted to her that he "and some guys" and "killed the taxi guy"; that Plaintiff showed her a cell phone that he admitted to stealing from Mr. Diop; and that she had overheard Plaintiff and others discussing details about the Raymond crime scene that could only have been known by the perpetrators.

60.     Ms. Gomez testified before the Grand Jury and at Plaintiff's trial to substantially the version of facts contained in her fabricated police statements.  But because her testimony was manufactured by the Individual Defendants and not actually a statement of her personal knowledge, it was largely incoherent and self-contradictory.

61.     Nevertheless, the prosecution assured the jury that—in spite of problems with her testimony—Ms. Gomez must have been telling the truth because she otherwise could not have known several non-public details about the murders.  For example, she knew about specific items that were stolen from the victims (a VCR and a credit card from Ms. Raymond, a cell phone from Mr. Diop), and she knew that Ms. Raymond's murderers had drunk juice and snacked on sandwiches in Ms. Raymond's apartment after shooting her.

62.     Ms. Gomez has since admitted that she did not actually learn these details from Plaintiff and his co-defendants; rather, she learned them from Defendants Donnelly and Aiello. The Individual Defendants showed Ms. Gomez crime scene photographs.  They told her about specific items that were stolen from the victims, and explained that crime scene evidence suggested that Ms. Raymond's murderers had eaten sandwiches and drunk juice in her apartment

during or after the murder.

63.     The Individual Defendants then forced Ms. Gomez to lie and claim that her knowledge of these and other details came from inculpatory statements she overheard Plaintiff and his co-defendants making.

64.     Ms. Gomez's testimony was entirely fabricated.  She now admits that she had never been to Plaintiff's house, much less witnessed a meeting at which two murders were planned; that she had never seen Plaintiff with a gun; that she had never overheard anyone admitting to perpetrating the Raymond or Diop murders; and that she learned about the sandwich and juice, the stolen items, and other non-public crime scene details from the Individual Defendants.  Plaintiff never told Ms. Gomez that he was involved in the Diop murder and never showed her a cell phone he supposedly stole from Mr. Diop.  Plaintiff never confessed, because he is innocent.  Ms. Gomez has now admitted all of this in sworn testimony and has confirmed that she was forced to lie by the Individual Defendants.

65.     Ms. Gomez's recantation has been corroborated by her brother, Hanley Gomez, Jr., who since at least 2004 has maintained that the Individual Defendants coerced him to sign statements without understanding their contents and forced his sister to perjure herself.

66.     When Ms. Gomez tried to refuse Defendants' demands that she give false testimony, they threatened her and warned her that her family would get in trouble if she got "stupid."  Defendant Donnelly threatened Ms. Gomez that her brother would be accused of the murders if she did not cooperate in the Individual Defendants' scheme to frame Plaintiff and his co-defendants.  Defendants Donnelly and Aiello threatened to jail Ms. Gomez and to have her parents deported if she did not provide perjured testimony to further their fabricated theory of the case.

67.     Ms. Gomez testified falsely because she was threatened, coerced, and intimidated by the Individual Defendants to lie.  Defendants Donnelly and Aiello knew that her testimony was false.

68.     Plaintiff was arrested, prosecuted, and convicted largely on the basis of Ms. Gomez's false statements, which were fabricated by the Individual Defendants.

### Miriam Tavares

69.     Ms. Tavares's testimony was also fabricated by the Individual Defendants.  They arrested and prosecuted Plaintiff for the Diop murder largely on the basis of Ms. Tavares's fabricated statements, even though those statements were uncorroborated and implausible and even though the Individual Defendants knew them to be false.

70.     At the Individual Defendants' behest, Ms. Tavares claimed that she witnessed the Diop homicide in intricate detail while perched on top of her toilet, looking out through a four-inch crack in her bathroom window 300 feet away from where Mr. Diop's vehicle crashed after he was shot.  She claimed that Plaintiff and at least five other people surrounded the cab, shot Mr. Diop, and stole his belongings.

71.     The information attributed to Ms. Tavares changed drastically over the course of the "investigation."  With each new statement, Ms. Tavares added new details and changed other ones, placed new "perpetrators" at the scene, and inserted narrative flourishes that rendered her account a cartoonish farce.  This evolution in Ms. Tavares's account was attributable to the coaching of Defendants, who encouraged her to lie.

72.     Over the course of multiple statements to the police, three separate days of Grand Jury testimony, and trial testimony, Ms. Tavares's story changed wildly.  Her first statement claimed that she was lying down putting her son to bed at the time of the Diop murder, heard a

gunshot, and thereafter walked to her bathroom window where she observed a second shot and saw Plaintiff and another individual running towards her.   But in subsequent statements, she added numerous precise details about the exact manner in which she claimed to have seen the murder unfold.  Over the course of more than half a dozen statements, Ms. Tavares changed: the number of "perpetrators" who were present; whether any of those individuals gesticulated or made verbal statements, and what they were; where the shooters were positioned; whether the "perpetrators" were holding items and what they were; what items were taken from inside the cab and who took them; how many vehicles were present and who was in them; and numerous other details.  At trial, she even mentioned for the first time that she was sitting outside on her stoop when Mr. Diop's taxi pulled up near her building, enabling her to see everyone who was present in pristine detail.

73.     Ms. Tavares's account was completely divorced from the reality of what the Individual Defendants knew or should have known about the Diop murder based on objective evidence.  For example:

a.     Ms. Tavares claimed that Mr. Diop's taxi was stationary outside her apartment when the shooting occurred.  But crime scene evidence showed that the taxi was still moving when Mr. Diop was shot and subsequently traveled several hundred feet, colliding with several objects along the way, before coming to rest.  The actual scene of the shooting was not visible *at all* from Ms. Tavares's vantage point.  The Individual Defendants intentionally ignored this obvious fact and failed to even review the crime scene report.

b.     Ms. Tavares stated that Mr. Diop was first shot in the legs by someone standing outside of the driver's side of the cab.  But the crime scene evidence, of which the Individual Defendants were or should have been aware, showed that Mr. Diop was shot twice, once in his upper back and once on his right side (*i.e.* by two people seated in the back seat, one directly behind him and one seated on the rear passenger side of the vehicle).

c.     Ms. Tavares stated that six perpetrators were present at the crime scene, but two other eyewitnesses had told the police that they only saw one or two individuals fleeing.  The Individual Defendants failed to follow up with the other two eyewitnesses.

74.     The Individual Defendants knew that Ms. Tavares's fake story was not a valid basis to suspect Plaintiff of wrongdoing.  They knew it because it was they who told her to lie. The variations in Ms. Tavares's statements, and their inconsistency with the physical evidence, are attributable to the fact that she was not actually describing events she had observed.  Rather, she was imperfectly attempting to regurgitate a story that Defendants had fed to her.  On at least one occasion, Defendant Donnelly even hand-wrote a statement to be signed by Ms. Tavares, who could not read or understand English.  There is no evidence that the statement was ever translated for her.

75.     The Individual Defendants gave Ms. Tavares, who was destitute, financial incentives to give false testimony.  They also exploited her personal bias against Eric Glisson, one of Plaintiff's alleged co-conspirators, to procure false inculpatory testimony.  The Individual Defendants knew that Ms. Tavares's statements were completely fabricated.

76.     As they had with Ms. Gomez, the Individual Defendants fed non-public details about the murders to Ms. Tavares to make her otherwise implausible, inconsistent testimony appear credible.

77.     But Mr. Diop was not murdered by Plaintiff or any of his co-defendants.  He was murdered by two gang members, acting alone, who later confessed.  None of the people Ms. Tavares accused had anything to do with the murder.

78.     That fact came to light when the office of the United States Attorney for the Southern District of New York ("USAO") re-investigated the Diop case in response to pleas from Eric Glisson, one of the other individuals Tavares accused.  Using investigative techniques that Defendants should have utilized in 1995 had they been acting with ordinary investigative competence, the U.S. Attorney's investigation solved the Diop murder and exonerated Plaintiff

16

and his co-defendants.

79.     In the late 1990s and early 2000s, the USAO was involved in dismantling a street gang called "Sex, Money, Murder."  Gilbert Vega and Jose Rodriguez were two members of that gang and had become cooperating witnesses when the federal authorities indicted members of the gang.

80.      As part of that cooperation, Vega and Rodriguez were required to admit all of their past criminal activity, and by 2003 both had confessed to shooting and robbing a livery cab driver on Croes Avenue in the Bronx in the winter of 1994-1995.  Following these confessions, the federal authorities spoke multiple times to the detective squad at the 43rd Precinct, where Defendants Donnelly and Aiello worked, attempting to confirm Vega and Rodriguez's information and to close what they imagined was an unsolved shooting investigation.

81.     No one at the 43rd Precinct or Bronx Homicide told the federal authorities about the Diop case, even though Detective Donnelly worked for the Bronx Homicide Task Force in 2003.  The federal authorities were instead told that no files matched the facts Vega and Rodriguez had provided.

82.     In the spring of 2012, the USAO learned for the first time from Eric Glisson that he, Plaintiff, Cathy Watkins, Carlos Perez, and Devon Ayers were in prison for a murder that bore an uncanny resemblance to the taxi driver murder to which Vega and Rodriguez had confessed years earlier.

83.     The USAO's chief investigator on the case has noted that "every undisputed fact regarding the Diop homicide corresponds to and corroborates the account given by" Vega and Rodriguez, including the time and approximate date of the shooting, the fact that the victim was an African livery cab driver, the pick-up and drop-off locations, the "exact location" of the

shooting, the ballistics, crime scene, and medical evidence, Mr. Diop's screams as the robbery

unfolded, the cab's collision with a parked car and a trash dumpster, and the theft of a cell phone

from the driver (with calls made to associates of Vega and Rodriguez).

84.    That investigator has also observed that the case against Plaintiff and his co-

defendants rested heavily on "the testimony of Miriam Tavarez [sic], a witness with an obvious

bias, who told materially different stories on different occasions, whose testimony was

inconsistent with the physical evidence, and who gave what I believe, based on my experience

and my familiarity with the location of the homicide, to be highly questionable testimony about

her ability to perceive the events of that night and what she actually did see, if anything."

85.    Had the Individual Defendants conducted a proper investigation, Vega and

Rodriguez would have been imprisoned for the Diop murder instead of Plaintiff and his co-

defendants.  For example, the Individual Defendants could have reviewed phone records

showing calls made from Mr. Diop's stolen cell phone after he was murdered.  The police

possessed those records at the time of the 1995 investigation.  Those records would have shown,

and do show, that Mr. Diop's phone was used to make several calls to associates of Vega and

Rodriguez, who were notorious members of a violent gang that operated in the neighborhood

where Mr. Diop was shot.  In fact, one call was made to the home of Rodriguez's mother—

where Rodriguez and Vega were both living at the time.

86.    Plaintiff's defense was never provided with these exculpatory phone records at

the time of his criminal trial.

87.     Because the Individual Defendants were too busy knowingly concocting a false

case against Plaintiff and his co-defendants and relying on statements by Ms. Tavares which they

knew to be false, the Individual Defendants failed to exercise the basic competence that would

have solved the Diop murder.  That left the true perpetrators, Vega and Rodriguez, free to

continue committing violent crimes in the Bronx for years.  For example, Jose Rodriguez was

one of the shooters in the infamous "Thanksgiving Murders" in November 1997 in the Bronx, in

which two people were killed during an annual football game between residents of two public

housing complexes.

88.     Instead of apprehending Vega and Rodriguez and preventing these later murders,

the Individual Defendants framed Plaintiff, causing him to spend almost eighteen years in prison

for crimes he did not commit.

### Kim Alexander's Testimony and Defendants' Withholding of *Brady* Material

89.     The third key "witness" against Plaintiff was Kim Alexander, who testified that

she had witnessed a man she identified as Charles McKinnon harassing Ms. Raymond as Ms.

Raymond left work on the night she was murdered.

90.     To support the charges against Plaintiff, the Individual Defendants sought to

establish a link between Mr. McKinnon and Ms. Raymond—who knew each other and who had

been romantically involved a number of years before the murder—and to link Mr. McKinnon to

Plaintiff and his co-defendants, Israel Vasquez, Devon Ayers, and Carlos Perez.  They invented

"facts" to "show" that Plaintiff and his co-defendants carried out the Raymond murder at Mr.

McKinnon's behest.  It was the only attempt ever made to establish a motive for Plaintiff to show

up at the apartment of Ms. Raymond, a stranger, and participate in her murder.

91.     Defendants pursued this strategy because there was no evidence to connect

Plaintiff and his co-defendants to Ms. Raymond.  Plaintiff was a nineteen-year-old who lived at

home with his mother at the time of the murder, while Ms. Raymond was a thirty-eight-year-old

Federal Express executive.  There was no evidence to connect Plaintiff and his co-defendants—

all teenagers or young men—with Ms. Raymond, who moved in entirely different social circles.

92.    To support their strategy, the Individual Defendants forwarded information to prosecutors purporting to demonstrate that Mr. McKinnon stalked and harassed Denise Raymond immediately prior to her death, and that he orchestrated the murder with what Defendant Aiello described as a group of "younger boys."

93.    Defendants relied on Ms. Alexander, Ms. Raymond's co-worker, who testified before the Grand Jury, at Plaintiff's trial, and at the trial of Charles McKinnon, to support their theory that Mr. McKinnon orchestrated Ms. Raymond's death.

94.     According to Ms. Alexander, she and Ms. Raymond left work together on the evening Ms. Raymond was killed.  She testified that as they waited on an upper floor of the Federal Express building for the elevator, a man, whom Ms. Raymond apparently knew, but who was a stranger to Ms. Alexander, suddenly appeared.  Ms. Alexander testified that she remained with Ms. Raymond and the man as they waited for the elevator.  The three then rode the elevator down to the lobby together, and exited the building at the same time.

95.    Ms. Alexander testified that Ms. Raymond appeared upset and agitated with the man throughout the entire encounter, and told him to leave her alone.

96.    Ms. Alexander testified that the man followed Ms. Raymond as she walked away from their office building, and that after this encounter, she never saw Ms. Raymond alive again.

97.    Ms. Alexander described the man in the elevator as a tall dark skinned man in his mid-thirties to early forties, wearing a trench coat.  Using highly suggestive identification methods, Defendant Aiello eventually managed to convince Ms. Alexander to identify that man as Mr.  McKinnon.

98.    Ms. Alexander presented powerful evidence to the Grand Jury and at Plaintiff's

trial to establish that Mr. McKinnon "set up" Ms. Raymond to be killed by Plaintiff and his co-defendants.

99.     At Plaintiff's trial, Ms. Alexander's testimony was the sole evidence presented regarding Mr. McKinnon's alleged contact with Ms. Raymond on the night of the murder.

100.    This alleged meeting between Ms. Raymond and Mr. McKinnon was also the sole overt act alleged in the indictment to have been committed by Mr. McKinnon to support a charge of conspiracy between Mr. McKinnon, Plaintiff, and the other defendants.

101.    But the basis for this conspiracy theory was completely false.  Mr. McKinnon never had an encounter with Ms. Raymond and Ms. Alexander on the night Ms. Raymond was murdered—and the Individual Defendants knew it.

102.    Security surveillance footage from the Federal Express office building in Manhattan showed that Ms. Alexander and Ms. Raymond left the elevator together, alone, on the night in question.  Mr. McKinnon was nowhere in sight.

103.    The Individual Defendants knew that their conspiracy theory was false because, shortly after Ms. Raymond's murder, Defendant Aiello viewed the security tapes at the Federal Express building and took possession of the tapes.  He knew that Ms. Raymond did not encounter Mr. McKinnon on the night of her murder, as Ms. Alexander claimed, because he saw Ms. Alexander and Ms. Raymond exit the elevator and the office building on the night of the murder with no black man present.  Upon information and belief, Defendant Donnelly also knew that the security tape undermined Ms. Alexander's testimony and he conspired with Defendant Aiello to withhold the tapes.

104.    Knowing that this evidence completely undermined their conspiracy theory against Plaintiff and his co-defendants, the Individual Defendants deliberately suppressed the

21

security tapes by failing to "voucher" them in violation of NYPD policy and falsely informing

the prosecutor, ADA Daniel McCarthy, that the footage showed nothing relevant to the

investigation.

105.    Defendant Aiello completed a Police Department report falsely claiming that Ms.

Raymond did not appear on the security tape.  As a result, Plaintiff, the Grand Jury, and the trial

jury never knew that there existed objective evidence contradicting the prosecution's theory that

Mr. McKinnon orchestrated and set up Ms. Raymond to be murdered by Plaintiff and his co-

defendants.

106.    These tapes should have been turned over to the defense at Plaintiff's trial under

*Brady v. Maryland*, 373 U.S. 83 (1963,) and its progeny.  The footage undermined the

prosecution's theory that Charles McKinnon orchestrated the Raymond murder and enlisted

Plaintiff, Mr. Perez, Mr. Ayers, and Mr. Vasquez to carry it out.  But this evidence was never

disclosed to Plaintiff at any point, including while he was appealing his wrongful conviction.

107.    More than one year after Plaintiff's conviction, Ms. Alexander testified at

McKinnon's trial and presented testimony that was the same in sum and substance as her

testimony during Plaintiff's trial.

108.    At the close of evidence in the McKinnon trial, and in response to the Court's

inquiry, the prosecutor (based on false information provided by Defendant Aiello) represented to

the Court that Defendant Aiello had met with Ms. Alexander to view a surveillance tape at the

Federal Express building, but did not take the tape into police custody because Defendant Aiello

did not see Ms. Raymond, Ms. Alexander, or Mr. McKinnon on the tape.

109.    The Court ordered the prosecutor to once again "specifically ask" Defendants

Donnelly and Aiello whether they had taken the tape into police custody, and whether Ms.

Raymond did, in fact, appear on it.

110.    At the same time, the Court gave permission for McKinnon's defense attorney to call an additional witness, a Federal Express security guard, referred to as "Mooney." McKinnon's defense attorney stated that this guard would testify that he viewed the surveillance tape with Defendant Aiello and Ms. Alexander; that the tape had, in fact, been taken into police custody by Defendant Aiello; and that it showed Ms. Alexander and Ms. Raymond exiting work alone.

111.    Only then did Defendant Aiello admit to the prosecutor that he had, in fact, taken possession of the tape.  The prosecutor then disclosed the tape to Mr. McKinnon's counsel.

112.    After the tapes were disclosed for the first time at the close of Mr. McKinnon's trial, the Court held that the tapes were *Brady* material, and that it was a "serious" violation to fail to produce this evidence.  The Court stated that the failure to turn over the tape sooner was grounds for a mistrial.

113.    During the McKinnon trial, the parties stipulated that Defendant Aiello had concealed evidence from the Bronx District Attorney's Office, which resulted in the prosecutor's failure to disclose this *Brady* material.  The stipulation, in effect, stated that Defendant Aiello lied by telling the prosecutor that he had viewed the tape but did not seize it, and by telling the prosecutor that he "did not see the deceased, Kim Alexander or [McKinnon]" in the tape, when in fact the tape showed Ms. Alexander and Ms. Raymond leaving the elevator together with Mr. McKinnon nowhere in sight.

114.    During their deliberations, the jury in Mr. McKinnon's trial asked to hear all the testimony about Ms. Raymond's departure from her office on the day of her death again and asked numerous questions about the footage.  Then, having heard the exculpatory evidence at

Mr. McKinnon's trial—as well as the fact that the lead detective in the Raymond investigation, Defendant Aiello, had concealed evidence from the prosecutor—the jury acquitted Mr. McKinnon of all charges.

115.     The exculpatory evidence was never produced at Plaintiff's trial or at any point during Plaintiff's appeal of his conviction, even though Ms. Alexander presented substantively identical testimony at Plaintiff's trial and before the Grand Jury as she had at Mr. McKinnon's trial.

116.     During Plaintiff's trial, the jury was never informed that Mr. McKinnon did not, in fact, illicitly enter Ms. Raymond's workplace the night of her murder, argue with her, and then follow her home.  They were left with uncontradicted evidence supporting the prosecution's theory that Mr. McKinnon had a strong motive for the murder, and that he then conspired with Plaintiff to carry out the murder.

117.     Had this *Brady* material been presented to the Grand Jury or during Plaintiff's trial, as it should have been, he would not have been prosecuted or convicted, much less remained wrongfully incarcerated for almost eighteen years.  Once Ms. Alexander's testimony had been discredited, there was not a shred of evidence to establish that Plaintiff had a motive for Ms. Raymond's murder.  Indeed, there was no evidence to connect Plaintiff to Ms. Raymond in any way.

### Defendants' Malice and Deliberate Indifference

118.     The Individual Defendants' failure to undertake even basic investigation tasks confirms their indifference to Plaintiff's innocence and their improper reliance on testimony they knew to be false.  For instance, the Individual Defendants never went to Ms. Tavares's apartment to see whether it was even possible for Ms. Tavares to observe what she claimed to have seen

from her apartment.  They never followed up with other witnesses whose versions differed

starkly from Ms. Tavares's description.  They did not review the Diop crime scene report, which

would have showed that Mr. Diop's cab moved hundreds of feet after he was shot, undermining

Ms. Tavares's claim that she could see where the shooting occurred from her apartment.

119.    Defendants' malice is confirmed by their behavior throughout the investigation.

They deliberately ignored investigative leads that would have proved Plaintiff's innocence.  For

instance, Defendants never questioned or otherwise investigated an individual who pawned a

bracelet with the word "Denise" and Ms. Raymond's birthday engraved on it shortly after Ms.

Raymond's murder.  They never followed up on records of outgoing calls made from Mr. Diop's

stolen cell phone—which would have led them to the real shooters, Vega and Rodriguez.  Nor

were those records ever turned over to Plaintiff's criminal defense counsel.

120.    The Individual Defendants also relied exclusively on obviously unreliable and

inconsistent witness statements; invented a connection between two unrelated murders without

any evidentiary basis; threatened witnesses to obtain testimony favorable to their theory; used

one witness as a language interpreter for another, despite the obvious risk that each witness's

account would be tainted; fed non-public crime scene details to the "witnesses" to make them

appear more credible; and failed to voucher the surveillance tape, among other misconduct.

121.    The Individual Defendants also used patently unreliable identification techniques.

For instance, they showed Ms. Gomez and Ms. Tavares a single photograph of Mr. McKinnon so

that they would later "identify" him in a line-up.  After Ms. Alexander told Defendant Aiello that

she had seen Ms. Raymond speaking with a man in a trench coat, he showed her a photo array in

which Mr. McKinnon was the only person depicted wearing such a coat.  When Ms. Alexander

told Defendant Aiello she could not make a positive identification, he declined to conduct a line-

up and instead showed Ms. Alexander video footage of Mr. McKinnon with his family.  And

Defendant Donnelly arrested Cathy Watkins after conducting an improper and highly suggestive

voice identification procedure wherein Watkins's voice was the sole sample.

122.    Defendant Donnelly also testified at Plaintiff's trial that Plaintiff spontaneously

confessed to the Diop homicide, using callous language, on the night he was arrested.  But

Plaintiff never, in fact, confessed.  There is no contemporaneous record of this "confession" in

Defendant Donnelly's notes and reports.  When Plaintiff was given the opportunity to make a

statement—which was videotaped—he said he was innocent.  That statement occurred

approximately two hours after Donnelly claimed that Plaintiff had given a spontaneous

confession.  Defendant Donnelly's untruthful claim that Plaintiff spontaneously confessed is

further evidence of malice.

123.    The Individual Defendants knew or should have known that they did not have

probable cause to arrest and prosecute Plaintiff for either homicide because they deliberately

used constitutionally impermissible practices to manufacture evidence against him that they

knew to be false.  There was no physical, circumstantial or testimonial evidence linking Plaintiff

to either crime.  Nevertheless, on March 14, 1995, the Individual Defendants caused Plaintiff to

be indicted for both murders.

124.    The Individual Defendants procured an indictment against Plaintiff in bad faith

and conspired to charge him with falsely committing two unrelated murders in bad faith.

125.    Plaintiff is innocent and has maintained his innocence from the inception of the

criminal prosecution against him.

126.    Unfortunately, Plaintiff's wrongful conviction was not an isolated incident.  By

the mid-1990s, the NYPD was well aware that arrests and prosecutions tainted by police

falsifications were a major problem—one that had been the subject of numerous lawsuits, civil settlements, and excoriating judicial opinions.

127.    In fact, on July 7, 1994—mere months before Plaintiff's arrest—a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Report") had noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." The Mollen Report referred to police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful."

128.    This widespread disregard for the truth caused the wrongful conviction of Plaintiff, his co-defendants, and countless others.

### Plaintiff's Injuries and Damages

129.    As a direct and proximate consequence of the aforementioned actions by the Defendants, Plaintiff suffered almost eighteen years of imprisonment.  During his incarceration, he sustained physical injuries including nerve damage in his neck as well as other injuries from abusive treatment by correctional officers.

130.    Plaintiff also suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit.  He was denied effective treatment for his emotional injuries while incarcerated, and continues to suffer mental anguish to this day.  For example, Plaintiff fears the police and his everyday activities are disrupted because he feels

compelled to actively avoid contact with law enforcement.  He was imprisoned when his father

and grandfather—with whom he had an extremely close relationship before he was

incarcerated—passed away.  He was not allowed to attend his grandfather's funeral.

131.    Plaintiff was also denied the opportunity to pursue normal relationships with, and

to enjoy the companionship of, family members and friends.  While he was incarcerated, he was

denied the opportunity to get to know his siblings' children.  To this day, his young nieces and

nephews look askance at him—and are afraid of him—because of his time in prison.

132.    Plaintiff was denied years of gainful employment and income.  His earning power

and ability to support himself have been permanently hampered by the years of productive work

experience his wrongful imprisonment denied him.

133.    Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated.  Nothing

can undo the reputational damage he has sustained.

134.    Plaintiff incurred substantial legal fees during the almost two decades he spent

seeking to prove his innocence.

135.    Plaintiff was denied fundamental constitutional rights and has lost his faith in the

American justice system.

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983; Malicious Prosecution Against Individual Defendants)

136.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

137.    The Individual Defendants initiated, or caused the initiation of, criminal

proceedings against Plaintiff.

138.    The Individual Defendants created false information and fabricated evidence

likely to influence the grand and petit juries, including but not limited to: (1) the Individual Defendants' fabrication of Ms. Gomez's and Ms. Tavares's statements concerning the source of non-public information they knew about the Raymond and Diop murders; (2) Defendant Aiello's fabrication of Ms. Alexander's testimony, which he and Defendant Donnelly knew to be contradicted by video evidence that they suppressed in order to mislead prosecutors; and (3) both Individual Defendants' participation in meetings with Cathy Gomez and Miriam Tavares at which their false testimony was discussed and planned.

139.    The Individual Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

140.    The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture, testimony that they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

141.    The Individual Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

142.    Without the false or utterly unreliable testimony that the Individual Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to prosecute and convict Plaintiff for the Diop and Raymond murders.

143.    Thus, the Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

144. Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

145. The Individual Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Bronx District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

146. Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

147. The Individual Defendants acted with actual malice, as demonstrated by, *inter alia*: their decision to falsely manufacture probable cause for Plaintiff's arrest and prosecution; their intentional and/or reckless disregard for proper investigative techniques and NYPD policies, including the use of witnesses as language interpreters for one another, failure to voucher evidence appropriately, and the use of unduly suggestive witness identification procedures; their decision to ignore valid evidence and investigative leads that pointed to Plaintiff's innocence; and their willingness to manufacture a false confession from Plaintiff.

148. The prosecution terminated in Plaintiff's favor when his convictions were eventually vacated and the indictment against him dismissed.

149.    The acts and conduct of the defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

150.    Upon information and belief, the two Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

## SECOND CAUSE OF ACTION

**(42 U.S.C. §1983; Denial of Due Process and a Fair Trial Against Individual Defendants)**

151.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    The Individual Defendants initiated, or caused the initiation of, criminal proceedings against Plaintiff.

153.    The Individual Defendants created false information and fabricated evidence likely to influence the Grand and petit juries.  Their misdeeds include but are not limited to: (1) the Individual Defendants' fabrication of Cathy Gomez's and Miriam Tavares's statements concerning the source of non-public information they knew about the Raymond and Diop murders; (2) Defendant Aiello's fabrication of Kim Alexander's testimony, which he knew to be contradicted by video evidence that he suppressed in order to mislead prosecutors; (3) Defendant Donnelly's fabrication of a supposed spontaneous confession by Plaintiff; and (4) the Individual Defendants' participation in joint meetings with Cathy Gomez and Miriam Tavares at which their false testimony was discussed and planned.

154.    The Individual Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the

31

prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

155.    The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture, testimony that they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

156.    The Individual Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

157.    Without the false or utterly unreliable testimony that the Individual Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to convict Plaintiff for the Diop and Raymond murders.

158.    Thus, the Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

159.    Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

160.    The Individual Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Bronx District Attorney's Office so that the it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

32

161.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

162.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding the two murders, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

163.    The aforesaid conduct of the Individual Defendants operated to deprive Plaintiff of his right to due process and a fair trial under the Fourteenth Amendment of the United States Constitution.

164.    Upon information and belief, the two Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

## THIRD CAUSE OF ACTION

### (Malicious Prosecution Claim Under New York Law Against All Defendants)

165.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

166.    Defendants Donnelly and Aiello caused the commencement and continuance of criminal proceedings against Plaintiff.

167.    There was no probable cause for criminal proceedings against Plaintiff, and Defendants Donnelly and Aiello knew or should have known as much.

168.   Defendants Donnelly and Aiello acted with actual malice.

169.   The criminal proceedings against Plaintiff terminated in Plaintiff's favor when his convictions were vacated and the indictment against him was dismissed.

170.   Defendant City is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employees, Defendants Donnelly and Aiello.

**JURY DEMAND**

171.   Plaintiff hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.   Compensatory damages in an amount to be determined;

2.   Punitive damages against the Individual Defendants in an amount to be determined;

3.   Pre-judgment interest as allowed by law;

4.   An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.   Such other further relief as the Court may deem just and proper.

Dated: March 11, 2014
      New York, New York

                        EMERY CELLI BRINCKERHOFF
                        & ABADY LLP

                        By:_____
                            Earl S. Ward
                            Elizabeth S. Saylor
                            David A. Lebowitz
                        75 Rockefeller Plaza, 20th Floor
                        New York, New York 10019
                        (212) 763-5000

                        ROMANO & KUAN, PLLC
                            Julia P. Kuan
                        100 Lafayette Street, Suite 401
                        New York, New York 10013
                        (212) 274-0777

                        *Attorneys for Plaintiff*